Slip Op. 15 - 131

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| GOLD EAST PAPER (JIANGSU) CO., LTD., NINGBO ZHONGHUA PAPER CO., LTD., and GLOBAL PAPER SOLUTIONS, | |
| Plaintiffs, | Before: R. Kenton Musgrave, Senior Judge |
| and | Consol. Court No. 10-00371 |
| BUREAU OF FAIR TRADE FOR IMPORTS & EXPORTS, MINISTRY OF COMMERCE, PEOPLE'S REPUBLIC OF CHINA, | |
| Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| APPLETON COATED LLC, NEWPAGE CORP., S.D. WARREN COMPANY d/b/a SAPPI FINE PAPER NORTH AMERICA, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, | |
| Defendant-Intervenors. | |

**OPINION**

[Sustaining third results of administrative redetermination on investigation of sales at less than fair value of certain coated paper from the People's Republic of China.]

Decided:  November 23, 2015

*Daniel L. Porter*, *James P. Durling*, and *Claudia D. Hartleben*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington DC, for the plaintiffs and plaintiff-intervenor.

*Alexander V. Sverdlov*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of Counsel on the brief was *Mykhaylo A. Gryzlov*, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*Terence P. Stewart*, *William A. Fennell*, and *Stephanie M. Bell*, Stewart and Stewart, of Washington, DC, and *Gilbert B. Kaplan*, *Joseph W. Dorn*, and *Daniel L. Schneiderman*, King & Spalding, LLP, of Washington DC, for the defendant-intervenors.

Musgrave, Senior Judge: The defendant's International Trade Administration, U.S. Department of Commerce ("Commerce") has submitted its third *Final Results of Redetermination Pursuant to Court Remand* ("*Redetermination*" or "RR3") on the antidumping duty investigation into *Certain Coated Paper from the PRC*.[1] Familiarity with the case[2] is presumed. To summarize, the investigation was remanded for (1) further insight into the use of market economy purchase ("MEP") prices for certain inputs procured from the Kingdom of Thailand by or for the plaintiffs (herein "APP-China"), and (2) further explanation of the targeted dumping methodology utilized.

---

[1] *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59217 (Sept. 27, 2010), PDoc 360, as amended by *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value and Antidumping Order*, 75 Fed. Reg. 70203 (Nov. 17, 2010) ("*Final Determination*"), and accompanying issues and decision memorandum ("*IDM*"), PDoc 353. The period of investigation ("POI") covers January 1, 2009 through June 30, 2009.

[2] *See Gold East Paper (Jiangsu) Co. v. United States*, 37 CIT ___, 918 F. Supp. 2d 1317 (2013) ("*Gold East I*") (remanding), 38 CIT ___, 991 F. Supp. 2d 1357 (2014) ("*Gold East II*") (remanding), 39 CIT ___, 61 F. Supp. 3d 1289 (2015) ("*Gold East III*") (remanding).

On remand, Commerce determined to disregard the MEP prices for the relevant inputs from Thailand because they had likely benefitted from subsidies and therefore were likely distorted. This changed the calculation of the normal value for APP-China but not the number of APP-China sales that were found to be targeted. *See* RR3 at10. Commerce also considered whether its current differential pricing methodology involving the Cohen's *d* test was a more appropriate measure of whether the targeted sales were "pervasive" than the prior *Nails* test. *Id*. at 8-11. After considering the question, Commerce determined that it was not; therefore it continued to rely on the *Nails* test in determining that APP-China's targeted was not "pervasive." *Id.* However, due to the changes in APP-China's calculated normal value occasioned by the foregoing, Commerce determined that it was appropriate to apply the average-to-transaction ("A-T") comparison to APP-China's targeted sales, and to apply the standard average-to-average ("A-A") comparison to the remainder. *Id*. at 9 n.42. APP-China's final dumping margin was 3.64 percent. *Id*.

APP-China contests Commerce's decision to reject the Thai input prices, and the defendant-intervenors ("Appleton") argue for remand of the targeted dumping issue, in particular the agency's decision to rely on the *Nails* test instead of differential pricing analysis. These issues are addressed in turn.

I

APP-China argues that Commerce's disregard of Thai prices for certain inputs represents an unexplained and unlawful reversal from the second remand determination. *See generally* APP-China Br. at 2  11. The court concludes otherwise.

As previously noted, Commerce may disregard prices for inputs purchased from market-economy countries based on its prior findings that a country maintained broadly-available, non-industry-specific export subsidies, if there is no evidence that the subsidy had been terminated and the flow of benefits had ceased. *See Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1297-98. Among other things, Commerce's normal practice when analyzing whether claimed MEPs for inputs are useable is to provide parties with an opportunity to submit "evidence that the program has been terminated and flow of the residual benefits has ceased". *See id.*, 39 CIT at ___ n.16, 61 F. Supp. 3d at 1297 n.16 (quoting Commerce's practice). Commerce in the second remand explained its practice but at the time believed that its use had been precluded by the law of the case. *Gold East III*, however, clarified that the practice was not inconsistent therewith and could be used. *See id.*, 39 CIT at ___, 61 F. Supp. 3d at 1297-98. Thus, during the third remand, Commerce applied its normal practice and analyzed the evidence that had been submitted during the second remand in accordance with its established standards. *See* RR3 at 6, 15.

Commerce explained that the evidence indicated that the Thai Tax Certificates for Export program had previously been countervailed as a generally-available export subsidy. *See* RR3 at 6, citing *Certain Apparel From Thailand: Final Results of Countervailing Duty Administrative Review*, 62 Fed. Reg. 63071 (Nov. 26, 1997) ("*1997 Apparel Review*"). Absent evidence that the program was terminated and the flow of benefits ceased, Commerce considers that the benefits under the program continue, and in this matter Commerce found that such evidence had not been provided.[3] Based on the information of record, therefore, Commerce determined that there was

---

[3] RR3 at 6 ("[d]espite the opportunities to provide such evidence in the original investigation
(continued...)

reason to believe or suspect that Thai prices were distorted by subsidies and that APP-China's claimed MEPs therefor should be disregarded. RR3 at 6.

APP-China argues that Commerce improperly changed its position from the second remand, or that it did not articulate the basis for a different conclusion when "the legal standard did not change and there is no new factual evidence." APP-China Br. at 3. However, the legal standard itself did not change, Commerce's understanding of it did after the prior decisions on the case were clarified in the latest remand opinion. Commerce detailed how this changed understanding led to a different result. *See* RR3 at 6, 15 (noting that "given . . . clarification that [Commerce's] normal practice is not at odds with [prior judicial] decisions," there was no reason "to depart from [the] normal practice here").

APP-China contends that the presumption Commerce uses contravenes the Federal Circuit's holding in *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999). APP-China Br. at 3-4. In APP-China's view, that case stands for the proposition that Commerce "must provide evidence to support a reasonable inference that the subsidy continues into the period of investigation." *Id*. (emphasis omitted). *AK Steel* considered what evidence was required to support finding that a countervailable subsidy actually existed for purposes of actually imposing a countervailing duty order. *See generally AK Steel*, 192 F.3d at 1370. The Federal Circuit explained that when analyzing this issue in the context of a full-blown countervailing duty investigation, the

---

[3] (...continued)
and subsequently in response to Commerce's reopening of the record in the second remand, APP-China has not provided any evidence that the tax coupon program has been terminated and the flow of benefits has ceased" ). By contrast, Commerce found that the petitioners had submitted information showing that recent changes to the Thai laws continued the subsidy program. *See generally* RR3 at 4; *Gold East III* 39 CIT at ___, 61 F. Supp. 3d at 1295-96.

fact that a subsidy existed at some point is insufficient; it must be found to have existed during the relevant period. *AK Steel*, 192 F.3d at 1376. *AK Steel* is therefore inapposite, because the standard for finding the existence of a subsidy in the countervailing duty context necessary to support imposition of a countervailing duty is higher, and therefore different, from a "reason to believe or suspect" standard that permits disregard of prices Commerce reasonably believes or suspects are distorted.[4] The prior remand order explicitly recognized that this standard can be satisfied when a subsidy program is shown to have existed in the past, and no evidence is presented showing that the program has been terminated and the flow of benefits has ceased. *See Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1298-99. On remand, Commerce found that to be the case based on prior countervailing duty proceedings that found broadly available, non-industry-specific export subsidies in Thailand, and APP-China submitted no evidence showing that the program had been terminated. *See* RR3 at 6, 15. And substantial evidence of record supports that determination. *See id*.

APP-China's argument that Commerce's remand analysis does not satisfy the test set out in *Fuyao II* fails for the same reason. *See* APP-China Br. at 5-7. The decision in *Gold East III*

---

[4] The court has previously observed that the "reason to believe or suspect" standard is "a relatively low threshold." *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 31 CIT 159, 169, 473 F. Supp. 2d 1365, 1374 (2007) (internal quotes and citations omitted). It does not require that Commerce conduct a formal investigation or determine that the particular supplier or product at issue benefitted from a specific subsidy: "Congress did not intend to require Commerce to conduct formal investigations in situations like this, and did not intend Commerce to definitively determine whether prices actually *are* subsidized." *Zhejiang*, 31 CIT at 168, 473 F. Supp. 2d at 1374 (italics in original); *see also China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 27 CIT 1553, 1557, 293 F. Supp. 2d 1334, 1338 (2003) ("[t]he 'reason to believe or suspect' standard articulated in the House Report by which Commerce's actions must be evaluated establishes a lower threshold than what is required to support a firm conclusion"). All that is required is that Commerce have some evidence supporting its suspicion that subsidy programs may exist. *See generally Zhejiang*, 31 CIT at 168-70, 473 F. Supp. 2d at 1374-75.

clarified that *Fuyao II* is just one way that Commerce may evaluate whether the evidence before it gives it a reason to believe or suspect that prices have been distorted, and is not the only "reasonable method." *Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1298-99; *see also CS Wind Vietnam Co. v. United States*, 38 CIT ___, ___, 971 F. Supp. 2d 1271, 1292 (2014) (making a similar observation). Commerce did not have to satisfy the particular test of *Fuyao II* as long as it "articulated with sufficient clarity" why it has "a valid belief or suspicion that input prices are distorted." *Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1299. Commerce has done so here.

        Commerce first recognized that it had previously countervailed the Thai tax coupon program as an export subsidy and pointed to a determination in which it had done so. *See* RR3 at 6, 18. Commerce described this program as one through which the Thai government "issue[d] tax certificates to exporters of record to rebate indirect taxes and import duties levied on inputs into exported products." *Id*. at 18 n.77. Next, Commerce explained that, under its practice, once the agency has determined that a particular program is countervailable, there is a presumption that the subsidy continues to exist absent evidence that the program has been terminated or benefits have ceased. *Id*. at 6-7; *see Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1297. Commerce noted that APP-China has placed no information on the record to suggest that the program has been terminated or that benefits have ceased, and therefore this presumption has not been rebutted. RR3 at 6. Finally, Commerce explained that the existence and availability of the countervailable export subsidy makes it reasonable to assume that the export prices of Thai goods are distorted. *Id*. at 6-7. *Cf. China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 27 CIT 1553, 1558, 293 F. Supp. 2d 1334, 1339 (2003) ("Commerce's actions are reasonable because a company like CMC's suppliers may have benefitted

Consol. Court No. 10-00371                                                                                          Page 8

from a generally available subsidy program given the competitive nature of the industry and by virtue of having engaged in foreign trade"). Commerce's remand thus articulates the basis for finding Thai prices distorted: it explains that the evidence of prior broadly-available, non-industry-specific export subsidies gives rise to an inference that prices may remain distorted by such subsidies, and justifies disregarding those prices in the absence of contrary evidence. No more is required.

Turning away from the legal standard, APP-China challenges how Commerce evaluated the evidence before it. But these challenges have no greater merit. For example, APP-China complains that Commerce improperly found the existence of generally-available subsidies based on only one piece of evidence -- the *1997 Apparel Review*. APP-China Br. at 5. But that ignores that Commerce also observed that it repeatedly "countervailed the Tax Certificates for Export Program as an export subsidy, first in *1989 Iron Pipe Investigation*," as well as the *1997 Apparel Review*. RR3 at 18 (citations omitted). Each of these determinations was supported by a fully-developed administrative record showing that Thai exporters were, in fact, receiving subsidies.

Contrary to APP-China's assertions, the mere fact that time had passed since these determinations were made does not, in itself, demonstrate that the subsidy terminated and the flow of benefits has ceased. *See* APP-China Br. at 5. Rather, under Commerce's normal practice (recognized in *Gold East III* as consistent with prior judicial decisions) APP-China was required to provide affirmative evidence to rebut the presumption that the program continues. The fact that the orders countervailing the tax coupon program had been revoked since 2000 does not constitute such information because, as previously stated, "[r]evocation is a discrete agency action, and the act thereof does not invalidate the prior administrative findings and conclusions upon which the issuance

Page 9

of the countervailing or antidumping duty order being revoked was validly predicated." *Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1297 (citing *Canadian Wheat Bd. v. United States*, 32 CIT ___, ___, 580 F. Supp. 2d 1350 (2008), *aff'd* 641 F.2d 1344 (Fed. Cir. 2011)). Indeed, revocation of a countervailing duty order may occur for any number reasons, *e.g.*, a lack of interest by the domestic industry or no likelihood of continuation or recurrence of material injury. That an order is revoked therefore does not automatically mean that the export subsidy program was terminated and the flow of benefits ceased; APP-China was required to provide affirmative evidence that this happened, which it apparently did not. *See* APP-China Br. at 4 (conceding that "affirmative evidence of the record may not directly demonstrate that the subsidy program examined in 1997 (*i.e.*, Tax Certificates for Exports programs) has been terminated.").

   APP-China's suggestion that the information petitioners submitted during the investigation may pertain to a different subsidy program than the one found to be countervailable in the *1997 Apparel Review* is not relevant for the same reason. *See* APP-China's Br. at 8. Simply put, Commerce is not required to provide affirmative evidence that the subsidy found in the *1997 Apparel Review* remains unchanged in all respects to infer that prices may continue to be distorted -- rather, APP-China must provide affirmative evidence that the program was terminated and the flow of benefits has ceased. Commerce expressly declined to decide on remand whether the evidence submitted by petitioners "provide[d] an additional basis for the reason to believe or suspect" that prices may have been distorted, explaining that such a finding is not necessary. *See* RR3 at 16. APP-China's critiques of that evidence are therefore unavailing. *See* APP-China Br. at 8-9.

Consol. Court No. 10-00371 Page 10

As an alternative argument, APP-China speculates that the information submitted by petitioners may nevertheless show that the subsidy program was somehow modified to no longer providing a subsidy. *See* APP-China Br. at 10. However, APP-China did not persuade Commerce that any subsequent modifications to the law under which the program was originally established have led to termination of the program and cause the flow of the benefits to cease, and Commerce found no reason to assume that they did.[5] Commerce considered that the evidence provided by petitioners was "even more remote," Def's Resp. at 10, because it did not relate to the program directly but rather to amendments to the law under which the program was originally established, but APP-China did not offer any analysis of the alleged changes or how they may affect the program, nor did it explain how these unspecified amendments could reasonably alleviate the reason to believe or suspect that exports from Thailand may have been subsidized. APP-China simply stated that some unspecified changes took place and, thus, Commerce should assume the program terminated. This type of speculation is not enough to displace Commerce's reasoning.

APP-China also argues that the tax program is a fact-specific export subsidy, not a broadly-available one, and therefore cannot be considered to benefit APP-China's suppliers. APP-China Br. at 6. Pointing to Commerce's 2001 countervailing duty investigation into hot-rolled carbon steel products from Thailand, APP-China argues that Commerce's findings suggest that the program was designed "to rebate indirect taxes and import duties on inputs used to produce exports" and that the program provided a benefit only when it exceeded a certain allowable amount. *Id*.

---

[5] Commerce explains that countries that provide countervailable subsidies to their industries may modify their program from time to time, but that many modifications are of a technical nature and do not lead to the termination of a program. Def's Resp. at 10.

(internal quotes omittes), citing *Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 Fed. Reg. 50410 (Oct. 3, 2001) ("*2001 Hot-Rolled Carbon Steel Flat Products*"). APP-China contends that Commerce was required to find that APP-China's suppliers satisfied both conditions before disregarding the prices APP-China paid. *Id*.

        Commerce's response is that such findings are only required if it needed to establish for certain the particular amount of a subsidy that actually existed, whereas the statutory requirement that it have a "reason to believe or suspect" that prices may be subsidized requires no such showing. Commerce also notes that in the *1997 Apparel Review*, it found that the Tax Certificates for Export program is an export subsidy, which can benefit companies in a number of different ways. Def's Resp. at 11, referencing *Certain Apparel From Thailand: Preliminary Results of Countervailing Duty Administrative Review*, 62 FR 46475, 46477 (Sep. 3, 1997), unchanged in *1997 Apparel Review*, and *Wheatland Tube Corp. v. United States*, 17 CIT 1230, 1231, 841 F. Supp. 1222, 1224 (1993) (explaining that "tax certificates rebate indirect taxes and duties on both physically incorporated inputs, and non-physically incorporated inputs (*e.g.* fuel, office equipment and services)" and "remission of indirect taxes and duties on the non-physically incorporated inputs is countervailable").[6] Commerce further argues that the fact that one company in an unrelated industry in the *2001 Hot-Rolled Carbon Steel Flat Products* investigation was found to have not taken advantage of the subsidy program does not mean that the subsidy was not broadly available or that there is no reason to believe or suspect that APP-China's producers could have taken advantage of the subsidy, and again, for that matter, APP-China had an opportunity to submit affirmative evidence

---

[6] Commerce also notes that APP-China does not contend that its suppliers do not use non-physically incorporated items (such as fuel, office equipment or services).

showing that its suppliers were not eligible for this subsidy program but apparently did not do so. *See id*. at 11-12.

In the absence of such evidence, it was not unreasonable for Commerce to presume the continued existence of a broadly-available, non-industry-specific program that may have distorted APP-China's suppliers' prices, and in the final analysis, APP-China does not point to any affirmative evidence showing that the subsidy program was terminated and the flow of benefits had ceased. Instead, APP-China essentially asks the court to infer as much based on its own weighing of the evidence on the record, which the court cannot do. The question is not whether the court agrees with Commerce's conclusion or whether it would have reached the same result as Commerce if the matter were here *de novo*, the question is rather whether the agency's decision is reasonable and supported by the record as a whole. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)). Commerce's determination satisfies that standard; accordingly, it will be sustained.

II

For its part, Appleton continues to argue that Commerce should have employed the Cohen's *d* test in its targeted dumping analysis. According to Appleton, Commerce's current Cohen's *d* test is the best way to determine whether the respondent's targeted dumping was "pervasive" and therefore appropriate to determining whether the remedy normally applied to targeted sales should be used on all sales made by respondents. However, Appleton's comments do not show that Commerce's decision to use the *Nails* test was unreasonable.

The question of whether a respondent's targeting is pervasive derives from Commerce's earlier regulation which has since been withdrawn. *See* 19 C.F.R. §351.414(c)(1) (2004). That regulation provided that Commerce would "normally" account for a respondent's targeting by applying the average-to-transaction (A-T) comparison only to targeted sales, and apply the standard -- and statutorily preferred -- average-to-average (A-A) comparison to the remainder. *Id.*; *see also* 19 U.S.C. §§ 1677f-1(d)(1)(A) (defining A-A as the preferred methodology); 1677f-1(d)(1)(B)(ii) (permitting the use of the average-to-transaction methodology only if Commerce explained why one of the default approaches could not account for the observed pattern of price differences).

The regulation provided that applying the A-T comparison to all of a respondent's sales would be appropriate if the respondent's targeting was "pervasive" or impossible to segregate. *See Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7350 (Feb. 27, 1996); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27375 (May 19, 1997) (Preamble). Because *Gold East I* found the attempt to withdraw that regulation in 2008 ineffective, the regulation continued to apply to the proceeding at bar. *See generally Gold East I*, 37 CIT ___, ___, 918 F. Supp. 2d 1317, 1327-28 (2013) (directing Commerce to apply the regulation in this case). Thus, the orders of remand requested Commerce to consider the best way to measure "pervasiveness", for example through Commerce's prior targeted dumping analysis known as the *Nails* test, or through its new, recently developed, differential pricing methodology including the Cohen's *d* analysis. *See Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1305-06.

Considering the question, Commerce determined that the *Nails* test was a more appropriate way to measure pervasiveness under the old regulation because Commerce's current differential pricing methodology was developed after the withdrawal of the regulation that established the pervasiveness requirement and was not designed to evaluate the regulation's criteria. RR3 at 10. In Commerce's words, the differential pricing "analysis was not designed to evaluate, and does not address" the requirements of "the withdrawn targeted dumping regulation." *Id*. Accordingly, Commerce continued to rely on the *Nails* test. *Id*. Using that test, Commerce concluded that "the percentage of targeted sales in this case is not large enough to demonstrate that the targeted dumping is so pervasive or widespread as to justify" applying the A-T comparison to all of APP-China's sales. Commerce therefore applied the A-T test only to the targeted sales.

Commerce points out that Appleton does not dispute that there is no basis to apply the A-T comparison more broadly if the *Nails* test is used to measure "pervasiveness" -- that is, they do not dispute that, under the *Nails* test, APP-China's targeted sales are neither pervasive nor impossible to segregate. *See generally* Appleton Br. at 3-11. Nor do they appear to dispute that the differential pricing analysis was not developed until after the old regulation was withdrawn, and therefore was not designed to satisfy its criteria. *See id.* Instead, Appleton claims that the *Nails* test was also not designed to determine pervasiveness because it was first applied after the old regulation was withdrawn -- and therefore should not be preferred over the Cohen's *d* test. Def-Ints' Br. at 8. However, Commerce contends it adopted the *Nails* test before it withdrew the old regulation -- and first applied it while that regulation was still in effect. Def's Resp. at 14, referencing *Mid-Continental Nails Corp. v. United States*, 34 CIT 512, 523, 712 F. Supp. 2d 1370, 1380 (2010)

("[r][e]vocation is not an admission by Commerce that the [*Nails*] test is unlawful"). Commerce, in other words, contends that the test was designed while "pervasiveness" was still a criterion that had to be measured, and in fact measured that criterion.[7]

Appleton also argues that the Cohen's *d* test should be used to answer the "pervasiveness" question because it is a valid statistical tool that represents a refinement over the *Nails* test. Def-Ints' Br. at 7. Responding, Commerce contends the argument fails for two reasons.

Commerce first contends Appleton's argument conflates different concepts, in that the differential pricing analysis is a refinement of determining whether sales satisfy the statutory criteria of forming a pattern of prices that differ significantly among consumers regions or time periods, not a refinement for determining whether targeted sales are pervasive. Commerce states that the reason for this is that the differential pricing analysis was developed at a time when Commerce understood the pervasiveness requirement to no longer apply, and that unlike the *Nails* test the differential pricing analysis "does not even measure the extent of targeted dumping *per se* -- rather, it measures all sales, those above and below normal value that exhibit a pattern of significant price differences" -- and using differential pricing analysis to measure "pervasiveness" of targeted (and dumped) sales "would therefore be extending the test far beyond its intended usage." Def's Resp. at 15, referencing RR3 at 21-22.

---

[7] Commerce also contends *Gold East III* "explicitly disagreed with Petitioners' claim that 'pervasiveness' is a new criteria that the *Nails* test did not examine." Def's Resp. at 15, referencing *Gold East III*, 39 CIT at ___, 61 F. Supp. 3d at 1304.

The above explanation seems contrived.[8] However, that is not fatal, because Commerce's other point is still valid, to wit, that Appleton's argument is essentially asking the court to substitute its judgment for that of the agency regarding which methodology is best suited to measuring regulatory criteria, and in the absence of demonstrated unreasonableness of the agency's chosen methodology, it would be inappropriate for a court to substitute judgment for that of Commerce on resolving the problem. *See*, *e.g.*, *Chang Chun Petrochemical Co. v. United States*, 37 CIT ___, ___, 953 F. Supp. 2d 1300, 1306 (2013) (declining to direct Commerce to use a targeted dumping methodology established in 2008 in a 2004 case).

*Conclusion*

Because the methodology that Commerce employed in its remand redetermination was reasonable, the results will be sustained and judgment entered accordingly.

          /s/ R. Kenton Musgrave
          R. Kenton Musgrave, Senior Judge

Dated: November 23, 2015
       New York, New York

---

[8] For example, it must be the case, of course, that differential pricing does in fact "measure," or at least indicate, the "extent" of targeted dumping in a sense, for if it does not do so then it runs the risk of being arbitrary and capricious.